George Edward Montgomery, Appellant, v. Henry M. Simon, Appellee.

Gen. No. 41,552.

Opinion filed April 15, 1941.

GARIEPY & GARIEPY, of Chicago, for appellant; FRED A. GARIEPY and JOHN SPALDING, of Chicago, of counsel.

CORWIN D. QUERREY and JOSEPH HARROW, both of Chicago, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

An action brought against defendant to recover damages for personal injuries sustained by plaintiff on June 4, 1938, when the automobile being driven by the latter was struck by the automobile being driven by defendant, at the intersection of Cermak road, a State highway, and First avenue, in the Village of North Riverside, Illinois. A jury returned a verdict for plaintiff assessing his damages at the sum of $2,000. Plaintiff filed a motion for a new trial. Defendant did not make a motion for a new trial. Plaintiff's motion for a new trial was denied and judgment was entered upon the verdict. Plaintiff appeals.

Defendant offered no evidence. Plaintiff contends that as the result of defendant's negligence he sustained serious, painful and permanent injuries, which have incapacitated him for life, and have caused him to spend large sums of money for medical services; that the damages awarded are so shockingly inadequate as to be an affront to justice, and that the trial court committed grievous error when it denied plaintiff's motion for a new trial. Defendant is satisfied with the verdict and contends that the amount allowed by the jury is adequate and the judgment should be affirmed.

After an examination of the evidence bearing upon the question of damages we have reached the conclu-

sion that plaintiff's contention is clearly a meritorious one.

The accident happened on June 4, 1938, about 2 p.m. Plaintiff was driving west on Cermak road. As he approached the intersection of the road and First avenue, he slowed down to about twenty-five miles per hour. Defendant, an automobile salesman, was proceeding north on First avenue, driving a new Nash automobile. He was on his way to keep an appointment with a prospective customer in Oak Park. Three hundred feet south of Cermak road on First avenue there was a "caution" sign, warning that there was a "stop" sign ahead. There was a stop sign for traffic going north on First avenue located on the southeast corner of the intersection. Defendant disregarded the signs, failed to reduce his speed, and, according to the great weight of the evidence, drove across the intersection at a speed of about forty miles per hour. As defendant drove across the intersection plaintiff's car had just crossed the center line of First avenue. Defendant's car struck plaintiff's car on the left side between the door post and the rear fender with such speed and force that as a result of the impact plaintiff's car was thrown to the right in a northwesterly direction. It then hurtled a ditch adjoining the highway, rolled forward, and came to a stop in the middle of a field of recently plowed soft dirt, about seventy-five or a hundred feet from the point of the impact. Several WPA men, working in the field, saw the accident and rushed to the place where plaintiff's car had stopped. Their attempt to extricate plaintiff from the car was not immediately successful because the door leading to the driver's seat was caved in and could not be opened. Plaintiff was unconscious and had to be lifted out. The WPA men attempted to revive him by throwing "a couple of buckets of water" over his head but they were not successful. While plaintiff was still unconscious he was taken to the

Hines Memorial hospital, in Hines, Illinois. What treatment he was given at the Hines hospital is not shown by the record. Shortly after 2 p. m. on the same day plaintiff was removed to the Peterson clinic, in Brookfield, Illinois, where he was examined by Dr. Philip Peterson. The doctor testified that plaintiff was in a semi-comatose state at the time; that he had several bruises and injuries about the head and face; a bruise at the left arm, and a bruise at the left knee; that he had an injury of the nose and he gave him first aid treatment to the nose. Under the direction of Dr. Peterson a number of X-ray pictures were then taken. These pictures were produced in evidence. The doctor testified that one picture showed a comminuted fracture of the bony structure of the nose on the left side; another showed ''a linear fracture of the occipital region of the skull;'' still another showed ''a slight compression fracture of the lower border of the third lumbar vertebra.'' The doctor ordered that plaintiff be taken home and kept in bed for an indefinite period. He remained under the general care of Dr. Peterson from June 4, 1938, until December, 1939. At the time plaintiff was taken home he was still in a semi-comatose state, which condition persisted for a number of days. Later on the doctor prescribed medicine to relieve pain and continued to give plaintiff this medicine as long as he treated him. Plaintiff had ''pain in the back and soreness and pain in the head; also headaches.'' The doctor ''prescribed rest in bed. He was in bed for at least two weeks.'' After that plaintiff was up part time. During the late summer and fall of 1938 plaintiff was given, at the doctor's office, three X-ray treatments and heat treatment by machine for the relief of pain. In December, 1939, the doctor found that plaintiff ''had a spasm, a tightness of the right leg.'' Plaintiff was then given three diathermy treatments to the right leg; also prescriptions for medicine to relieve pain. The doctor testified

that his bill for services amounted to $135. On the evening of the accident after plaintiff had been brought home in an ambulance from the Peterson clinic he was bleeding from the eyes, nose, mouth and ears, and Dr. Weber, of LaGrange, a specialist, was called to treat these conditions. Dr. Weber testified that he was a specialist in the treatment of the eye, ear, nose and throat; that he saw plaintiff on the evening of June 4, 1938, and upon examination he found that plaintiff had a fractured nose; "the septum in his nose which is a partition, was quite pushed over to one side and on examination you get crepitice and that is when you get this feeling that there is a broken bone there." The doctor set the fracture. He also found that plaintiff had some small pieces of glass in his eyes, and he "extricated" all of the glass. The next day the doctor found that plaintiff's eyes were infected and in pretty bad condition. He saw plaintiff seven times and was paid $55 for his services. During the first four weeks immediately following the accident plaintiff was attended by a practical nurse. In the year 1939 his sister "cared" for him. During the year 1938 Dr. Linnell, an osteopath, treated plaintiff. For a week the doctor went to the home of plaintiff, then plaintiff went to the doctor's office. The doctor gave plaintiff ten treatments, one a day. In the summer of 1939 plaintiff's physical condition was becoming worse and in December he visited the Warren clinic, in Michigan City, Indiana, for treatment. Five additional trips were made by plaintiff to this clinic. Dr. Warren testified that he had conducted the clinic for forty-four years; that on December 29, 1939, he examined plaintiff; that he found that plaintiff "had a partial paralysis of the right leg, a traumatic neuritis of the leg." In response to a hypothetical question the doctor stated that in his opinion there could be a causal connection between the accident and the condition of paralysis of the right leg. In response to a second

hypothetical question the doctor testified that the condition of paralysis of the right leg, in his opinion, is permanent. The doctor further testified that he gave plaintiff intravenous treatments of potassium iodide, sodium salicylate and colchicine every second day in order to absorb anything in the brain that might be pressing, and that this treatment extended over a period of four weeks; that in addition plaintiff was treated in the bath department, with heat packs and physio-therapy for the pain in his leg and back. Upon cross-examination he testified that in his opinion nothing "would cure the man in the condition I found him;" that the treatments given him and the medicines given him were merely for the purpose of relieving pain and inducing sleep. The doctor further testified that the bill of the clinic (Dr. Warren) for services rendered was $200. There was an additional bill for $116.05 of the clinic (hospital).

Dr. Benjamin Kessert testified that he was connected with the neuro-psychiatric department of the Edward Hines hospital and was also on the faculty of the Northwestern University Medical School; that his practice concerned diseases of the nervous system; that he examined plaintiff in March, 1940, at the office of Dr. Costenbader, in LaGrange, Illinois; that he made certain objective findings; that "my objective findings were those of the left facial weakness and weakness of the grip power in his left hand, a swelling and discoloration of the right lower extremity; the discoloration was manifested by generalized flushing; there was limitation of motion in the right lower extremity, the deep tendon reflexes in the right lower extremity were absent, as compared to the opposite side." The doctor further testified that he "prescribed physiotherapy treatments and potassium iodide, by mouth, medication. Q. For what purposes were those medicines and that type of treatment given? A. The physio-therapy was prescribed for the condi-

tion of his right lower extremity and the potassium iodide was prescribed for the condition of the head."

Dr. James C. Clark testified that he examined plaintiff for the Prudential Insurance Company on March 30, 1940; that he found "a stiffness which means spastic paralysis, it means a rigid paralysis of the right leg, partial paralysis of the right leg;" that plaintiff walked with a crutch; that "the reflexes in the left leg were normal, those in the right leg were abnormal and exaggerated;" that "other findings I made were a swelling of the right leg, the right leg was swollen more than the left, that is certainly objective and there was some increased temperature in that leg over the left leg. As I said before, the leg was stiff, more rigid than normal and the reflexes were exaggerated;" that the rest of his findings were not objective. The doctor further testified: "My opinion from my examination of Mr. Montgomery on March 30, 1940, is that he was not able to perform any manual employment."

We will epitomize some of the salient evidence given by plaintiff, his wife and son: Plaintiff was fifty-five years of age at the time of the accident and his condition prior to the accident "was perfect." He was the owner of a "building material and coal yard." He managed the business and also acted as a salesman. Most of the time prior to the accident he worked from twelve to fifteen hours a day. At the time of the accident his weight was 200 pounds; at the time of the trial he weighed 155 pounds. For six weeks after the accident he remained in bed. After that time he was up during the day, at first for an hour or so until gradually he remained up "almost a full daytime." At first he used a cane in walking and afterward a crutch. He never had any trouble with the right leg prior to June 4, 1938, but he had trouble with it right after the accident. "I couldn't make it start to walk. I first noticed this when I first got out

of the car after I was up and around. When I attempted to use the leg for walking it just stood still. It wouldn't walk for a minute or so before I could get it moving.'' He suffered pain constantly. His head and back bothered him all the time; he felt as though he had been hit with a blunt instrument on top of the head. The pain in his back he described as ''like a toothache.'' His leg pained him ''from the toe up to the hip;'' ''it is there all the time. I do not sleep nights.'' In September, 1938, plaintiff went to his place of business for short periods, increasing the time gradually until he stayed there almost a full daytime. He answered the telephone but did no manual work. He was not able to go to his place of business after December 1, 1939. During 1939 he did not go to the office every day and during the last few months of that year he would be at the office only a few hours a day, when he would lie down on a couch. As a result of the accident Mrs. Montgomery was compelled to put on salesmen to do the work that had been performed by plaintiff before the accident.

The evidence showed that plaintiff paid to doctors and a nurse, $606.05. Evidence was also introduced to the effect that plaintiff suffered a loss in earnings and income of $1,090. Plaintiff also paid for medicines, but we find no evidence in the record as to the amounts paid. It thus appears that the jury awarded plaintiff for past and future pain and suffering; permanent physical disability, making gainful employment by plaintiff impossible; loss of future earnings and income, and future expenses for medical services, approximately $300. As plaintiff's counsel argues, the amount of the verdict is so inadequate that it shocks one's sense of justice. We have been endeavoring to ascertain, from the record, if possible, what could have caused the jury to award plaintiff such inadequate damages. The only reason we can find in the record is the following: Dr. James C. Clark,

a witness for plaintiff, whose testimony has been heretofore referred to, examined plaintiff, in his home, *for the Prudential Insurance Company* on March 30, 1940. As heretofore stated, the doctor testified to the partial paralysis of the right leg that he found, and further stated that he was of the opinion that plaintiff was not able to perform any manual employment. It may be that the jurors, from the doctor's evidence, assumed that plaintiff had a policy with the Prudential Insurance Company and that he was receiving, or would receive, compensation from that Company, and that this assumption influenced them to reduce the amount of damages that they otherwise might have awarded plaintiff. There was nothing in the record to show that plaintiff was receiving or might receive compensation from the Insurance Company, but even if the record showed that he was receiving compensation from that Company, such compensation could not in any way affect his right of compensation against defendant.

It is the settled law of this State that where it is obvious that a jury has failed to take into consideration proper elements of damages which have been clearly proven, and have awarded the plaintiff wholly inadequate damages, a motion for a new trial should be sustained by the trial court. (See *Browder v. Beckman,* 275 Ill. App. 193, 198, 199; *Parke v. Lopez,* 306 Ill. App. 486, 489, 490.) In *Kilmer v. Parrish,* 144 Ill. App. 270, 274, the court said: "At common law new trials were not allowed upon the ground that the damages allowed by the jury in actions for torts were insufficient. But the modern rule is that a new trial may be granted where the verdict is grossly inadequate, for the same reasons as those governing where the verdict is excessive. *Paul v. Leyenberger,* 17 Ill. App. 167; *Hackett v. Pratt,* 52 Ill. App. 346; *Hamilton v. Pittsburg, C., C. & St. L. Ry.,* 104 Ill. App. 207; *Bourke v. Anglo-American Provision Co.,* 90

Ill. App. 225; 14 Encyc. of Pl. & Pr. 764, and cases cited. A verdict for a grossly inadequate amount stands on no higher ground on legal principles than a verdict for an excessive or extravagant amount.'' In *Dimick v. Schiedt*, 293 U. S. 474, 486, the court said: ''Where the verdict returned by a jury is palpably and grossly inadequate or excessive, it should not be permitted to stand; but, in that event, both parties remain entitled, as they were entitled in the first instance, to have a jury properly determine the question of liability and the extent of the injury by an assessment of damages.'' Many other cases to the same effect might be cited, but the rule stated is well established. In the instant case defendant offered no evidence as to the accident, nor as to plaintiff's injuries, and it would amount to a miscarriage of justice to allow the present judgment to stand.

The judgment of the Circuit court of Cook county is reversed and the cause is remanded for a new trial.

*Judgment reversed and cause remanded for a new trial.*

FRIEND, P. J., and JOHN J. SULLIVAN, J., concur.