Helen Pertolanitz, Appellant, v. Chicago Transit Authority, a Municipal Corporation, and Arnold Bumbulis, Appellees.

### Gen. No. 48,786.

First District, Third Division.
November 6, 1963.

Hugh M. Matchett, F. Patrick Conlon, and DiGrazia and Snyder, all of Chicago, for appellant.

William J. Lynch, William S. Allen, Fred J. O'Connor and James E. Hastings, all of Chicago, for appellee, Chicago Transit Authority.

MR. JUSTICE McCORMICK delivered the opinion of the court.

This appeal is taken by the plaintiff from a judgment of the Circuit Court of Cook County in the amount of $1,370 entered in favor of the plaintiff in a suit brought by her for personal injuries allegedly sustained as a result of an accident involving an automobile driven by defendant Arnold Bumbulis, an automobile driven by one Edward Backus, and a Chicago Transit Authority express bus. The plaintiff was a passenger on the bus.

From the record it appears that on September 3, 1954 in the forenoon a Ford station wagon driven by Edward Backus entered Archer Avenue and headed in a southwest direction on Archer Avenue at a speed under the 30 miles per hour speed limit. The traffic on Archer Avenue heading southwest was fairly light and that going northeast to the loop rather heavy. Backus drove in the left, or inside, lane next to the center line until coming to a gradual stop at the intersection of Kolmar and Archer Avenues. He testified that his left-hand signal light was on and that after stopping he turned his wheels in preparation to make a left turn. Backus' car remained stationary, while waiting to make the left turn, anywhere from one to two minutes. At that time his vehicle was struck in the rear by a Buick car driven by Arnold Bumbulis. That car had passed a CTA bus heading in a southwest direction, and the driver of that bus stated that a block before Kolmar Avenue Bumbulis

was driving at 40 to 45 miles an hour and that Bumbulis did not veer or slow down but drove right into the rear corner of the Ford at about 40 miles per hour. A CTA bus was being driven in a northeasterly direction. There is a railroad track about 400 feet southwest of the intersection. The driver of the bus first saw the Ford before he had completed crossing the track. He was driving in the lane next to the center line. The driver of the bus testified that at the time when he saw the Ford it was standing still waiting to make a left turn to go south on Kolmar Avenue. At the time he crossed the railroad track the bus was going at about 15 to 20 miles an hour. After he had crossed the railroad track he increased his speed up to 25 or 28 miles an hour. This was done after he had seen the Ford waiting to make the left turn. He saw the Buick coming behind the Ford, and the Buick was going about 50 miles an hour. The Buick struck the Ford. The Ford immediately moved from a standing position into the northeast-bound lane of Archer Avenue. The bus and the Ford collided. The driver further testified that he was aware from the first moment he saw the Ford that it was waiting there to make a left turn, though he says he does not remember if the Ford had a turn signal on.

The bus had about 15 passengers aboard. Among these passengers was Helen Pertolanitz, the plaintiff herein. She was a housewife 45 years of age at the time of the injury. Before the time of the accident she had had an operation in 1936 for a prolapsed womb. In 1949 she had a hysterectomy. After that operation she began to have trouble with incontinence of urine. In 1951 she had slight surgery to correct that condition. In 1953 she again had surgery for that same condition and for vaginal repair. On February 12, 1954 she was injured in an accident in the railroad yards where she was working in a Pull-

man car. The Pullman car was struck by another car and she injured her back. Again her incontinence of urine returned. In February 1954 Dr. Matthew Kiley, who testified at the trial, first saw her. He operated on her on June 8, 1954 because of the problem she was having with her urine. He also repaired the vagina. He ordered her to have postoperative treatment. On July 20, 1954 and on August 10, 1954 he examined her and found her in good shape. On September 3, 1954 she was riding on an Archer Avenue CTA express bus in the vicinity of Kolmar Avenue and was seated on the first forward looking seat. She had a foot propped up on the long seat, and while she was seated in that position the bus was involved in the accident. She stated she did not know how the accident happened, but that the bus seemed to go up in the air with a sudden jerk and she flew forward and fell on the bar that separated her seat from the long seat. Her left foot cleared the bar completely and her right foot got caught under it. The bar struck her across the middle of the stomach in the same place where the surgery had been done. She felt a burning sensation in her abdomen. Her right foot was bruised, skinned, and bleeding. She went across the street to an ambulance which took her to a hospital. She received medical attention from a doctor, and x-rays were taken of her right foot. The doctor bandaged it. She was unable to put on her shoe. The doctor at the hospital advised her to go to a medical center, and after she had her son drive her home she went to that center. The doctor there examined her foot, again treated it, but did not examine her stomach. He gave her some pills so that she could sleep. Again she was treated at the medical center. The foot was re-bandaged and the doctor gave her some pills to settle her stomach and nerves. She kept vomiting for over a week. On October 7, 1954

260

she went to another doctor. She again was suffering from incontinence of the urine. On October 8, 1954 she went back to Dr. Kiley. She told him about the accident and the treatments which she had received. He then treated her in an attempt to control the urine without an operation. Dr. Kiley sent her to a neurologist who treated her. After the treatment she returned to Dr. Kiley who told her she would have to have surgery. On February 28, 1955 she was operated on by Dr. Kiley. The surgery did not help. All during 1955 she suffered from incontinence of urine and remained under Dr. Kiley's care. During that entire period she suffered pain. In 1956 Dr. Kiley advised her to have the "Marshall-Marchetti" operation, and he performed that operation on her on April 1, 1956. The operation lasted from 10:35 to 12:05. This was heavy abdominal surgery and the plaintiff was very sick. Dr. Kiley testified that there was no other technique known to medical science that would help her as far as he knew. The result of the operation was good and after it the plaintiff had no incontinence. He advised her not to do any lifting or heavy work of any kind. Dr. Kiley saw her off and on during 1956, and saw her December 3, 1956. He gave her strict examinations during that year and she felt pretty good during 1957 except for pain in her right side. She was under his care until April 1958. The last time he saw her, April 1, 1958, the plaintiff was having no difficulty with her urine. Her general condition was pretty good. The plaintiff testified that since she saw Dr. Kiley the last time she has felt pretty good and has no difficulty with incontinence of urine. She is being treated by another doctor for diabetes.

Dr. Kiley testified that in his opinion, based upon a reasonable degree of medical certainty, the condition he found and treated subsequent to November 3, 1954 could or might be due to trauma—abdominal pressure

or force, and that he had an opinion, based upon a reasonable degree of medical certainty, that there was a causal connection between the accident of September 3, 1954 and the conditions that he found on February 28, 1955. He stated that any sudden increase of intra abdominal pressure—being thrown up against the seat ahead of her—could have caused the condition, and there was no reason for him "doubting or saying there was any other reason for causing" her incontinence. She did not have it before and she did after.

Plaintiff's doctor and hospital bills after September 3, 1954 totaled $1,770, and she estimated that she paid $90 to $100 a year for medicine during that period. On September 3, 1954 she was employed by the Pullman Company as a coach cleaner, and she had worked steadily for the year before the accident. Her average weekly earnings were $71 a week. She has not gone back to work at any time since September 3, 1954. She has attempted to get other employment without success.

The plaintiff in her post-trial motion asked for a new trial on the question of damages only, or in the alternative for a new trial. This motion was overruled on December 20, 1961. A judgment was entered on October 24, 1961. This appeal is taken from the judgment.

In this court the plaintiff contends that the damages are wholly inadequate and that the judgment should stand on the issue of liability and be reversed on the issue of damages only and the cause be remanded for a new trial on that issue. The Chicago Transit Authority here contends that its liability was highly questionable and that that fact justified the trial court's denial of plaintiff's motion for a new trial because of inadequate damages, and furthermore, that

the damages awarded by the jury were not inadequate.

The Chicago Transit Authority in its brief makes the statement that "in the instant case there is not a shred of evidence of negligent conduct," and further states that its liability is highly doubtful. Plaintiff, on the other hand, relies on Paul Harris Furniture Co. v. Morse, 10 Ill2d 28, 139 NE2d 275, where the court awarded a new trial solely on the issue of damages, and in that case the court takes the view that the verdict against the defendant was amply supported by the evidence and that the question of damages is separable and distinct from the issue of liability.

Edward Backus filed a suit (54 C 15325) against Bumbulis, to which suit Bumbulis filed an answer and counterclaim. The plaintiff, Helen Pertolanitz, filed a suit (55 C 5138) against the Chicago Transit Authority and Bumbulis, Clarence McAdams and William Horn, d/b/a Universal Grinding & Tool Service, and Edward Backus. In that complaint it is alleged that Backus was the agent of Universal Grinding & Tool Service. To that suit the Chicago Transit Authority filed an answer, as did Bumbulis. Backus (in 54 C 15325) by leave of court filed an amended complaint, joining the Chicago Transit Authority and Bumbulis as parties defendant, to which amended complaint an answer and counterclaim were filed by Bumbulis and an answer by the Chicago Transit Authority. In the suit filed by Helen Pertolanitz by leave of court a counterclaim was filed by Backus and Universal Grinding & Tool Service against Bumbulis and Chicago Transit Authority, which counterclaim was answered by the Chicago Transit Authority and Bumbulis. An order was thereupon entered consolidating the suit in which Backus was the original plaintiff with the one in which Pertolanitz was the plaintiff.

The case was tried before a jury. In the instant case the proceedings following the return of the verdict of the jury are complex and inconsistent.

In the record in the original case (54 C 15325) brought by Backus there is a jury verdict finding for Backus against Bumbulis and assessing damages in the sum of $5,998.68, and the same verdict finds for the Chicago Transit Authority and against Backus, and the jury also finds for Backus and against Bumbulis on the counterclaim. In the suit brought by Pertolanitz the jury found for her against Chicago Transit Authority and Arnold Backus, and assessed damages against the Chicago Transit Authority for $450 and against Bumbulis for $920, and they found Backus not guilty. The verdict was returned by the jury on October 24th, and on October 25th at 10:00 there was some discussion by the court with the jury in the presence of counsel. There was some discussion with reference to the Bumbulis case against Backus, but with reference to the Pertolanitz case the court said: "Then as to the other one, Pertolanitz versus Chicago Transit Authority, Backus, and Bumbulis, I looked it over and in response to my inquiry I was told by you that it was the verdict of the jury that both C. T. A. and Bumbulis were responsible and that the extent of the damages were $450 and $920 in the aggregate of $1,370, is that correct?" A juror responded that that was correct. The court then said: "Then I told you that the verdict must be whole, and since it was the verdict of the jury that the amount of damages were $1,370, the $1,370 was written in there at my suggestion. You wrote them in and you scratched out the others?" A juror again answered that is correct. On the same day the record shows a judgment was entered in the case, as follows:

"Edward Bachus [sic]
 vs 54 C 15325
Arnold Bumbulis and Chicago Transit Authority,
 consolidated with
Helen Pertilanitz [sic]
 vs 55 C 5138
Chicago Transit Authority, a Municipal Corpora-
tion and Arnold Bumbulis and Edward Bachus
[sic]

"This day again come the parties to this suit by their Attorneys respectively, and the Jury heretofore impaneled herein for the trial of this cause, also come.

"Whereupon the Court instructs the Clerk to open and read the verdict of the Jury. Which verdict is as follows, to wit: We, the Jury find for Edward Bachus [sic], and against Donald [sic] Bumbulis, Defendant and assess the damages in the sum of (Five Thousand Nine Hundred Eighty Eight Dollars and Sixty Eight Cents) $5,988.68. Further, We, the Jury find for Edward Bachus [sic], counter Defendant against Arnold Bumbulis, Counter Plaintiff, *and further we the Jury find for Plaintiff, Helen Perlanitz [sic] against the Chicago Transit Authority, a Municipal Corporation, and Arnold Bumbulis and assesses the damages at the sum for Helen Per-lanitz [sic] in the sum of (One Thousand Three Hundred Seventy Dollars) $1,370.00 and find Ed-ward Bachus [sic] Guilty.*

"Therefore, it is considered by the Court, that the Plaintiff, Edward Bachus [sic] do have and recover of and from the Defendant, Arnold Bumbulis, his damages in the sum of (Five Thousand Nine Hundred Eighty Eight Dollars and Sixty

265

Eight Cents) $5,988.68 in form as aforesaid by the Jury assessed together with its costs and charges in this behalf expended and have execution therefor.

*"And further it is considered by the Court, that the Plaintiff Helen Perlanitz [sic] do have and recover of and from the Defendant, Chicago Transit Authority, a Municipal Corporation, her said damages in the sum of (One Thousand Three Hundred Seventy Dollars) $1370.00 in form as aforesaid by the Jury assessed together with its costs and charges in this behalf expended and have execution therefor."* (Emphasis ours.)

(The only verdict and judgment with which we are concerned are the ones which are italicized.)

█ It is apparent that the judgment entered does not follow the verdict. In 23 ILP Judgments, sec 21, it is said:

"A judgment must represent the ultimate and fixed precise determination of the judicial proceeding in which it is entered, and in substance it must show distinctly, and not inferentially, that the matters in the record have been finally disposed of in favor of one of the litigants or that the rights of the parties in litigation have been finally adjudicated."

It is elementary law that while it is the act of the court which constitutes the judgment, the record is conclusive evidence of what that act is. Also in 23 ILP Judgments, sec 19, it is said:

"In a jury trial in an action at law the verdict, if supported by evidence, is the basis on which the judgment of the court is rendered, and after a jury trial and verdict the judgment must fol-

266

low the verdict unless a sufficient reason for giving a judgment notwithstanding the verdict appears. . . .

"With respect to the parties for and against whom it is given, a judgment must conform to the verdict . . . ."

In their briefs in this court both parties refer to a judgment against the Chicago Transit Authority and Bumbulis. As a matter of fact there was no judgment against Bumbulis, and the judgment entered does not follow the verdict.

The argument of the Chicago Transit Authority that there is little or no liability proved against the Chicago Transit Authority is not true. In this case no objection was made to any of the instructions. We find in the record that the following instruction was given:

. "There was in force in the State of Illinois at the time of the occurrence in question a certain statute which provided that:

"The driver of a vehicle within an intersection intending to turn to the left shall yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or so close thereto as to constitute an immediate hazard, but said driver, having so yielded and having given a signal when and as required by this Act, may make such left turn and the drivers of all other vehicles approaching the intersection from said opposite direction shall yield the right of way to the vehicle making the left turn.

"If you decide that a party violated the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining

whether or not a party was negligent before and at the time of the occurrence."

No reference is made in the briefs to this statute, and on argument, in response to questioning by the court, counsel seemed to put very little reliance upon it. In Smith Hurd Illinois Annotated Statutes, chap 95½, sec 166, there appears the following Historical Note: "The Act of 1949 completely revised this section, using language almost entirely new. The former section required a driver approaching an intersection with intent to make a left turn to do so with caution and with due regard for traffic approaching from the opposite direction, and not to make the turn until he could do so safely."

 This court recognizes that it is axiomatic that the public does not become familiar with all the changes made in the law by the legislature immediately and should be allowed a reasonable time to become cognizant of new and changed rules of law. See Weidler v. Westinghouse Elec. Corp., 37 Ill App2d 95, 185 NE2d 100; Ariola v. Nigro, 13 Ill2d 200, 148 NE2d 787. However, even to the most liberal minded person it would seem that a period of fourteen years would be adequate for any person to be aware of a statutory change. However, this court takes judicial notice that this statute has never been observed or enforced and apparently is unknown to the officers whose duty it is to control traffic in this city.[1] Under

---

[1] On September 17, 1963 an editorial appeared in the Chicago Sun Times headed "On Making a Left Turn." The editorial was as follows:

"From an observation point behind a steering wheel we venture the estimate that 99 motorists out of 100 do not know Illinois vehicle regulations concerning the making of left turns at intersections.

the terms of the statute the Chicago Transit Authority was very close to being negligent as a matter of law. Under the provisions of the statute when the bus which was involved in the collision crossed the railroad track 400 feet from the intersection, the driver testified that he saw the Backus car was "waiting to make a left turn to go south on Kolmar avenue." When he first saw that car it was standing still. He further testified that there was a railroad track 400 feet from the intersection and that he first saw the Backus car before he completed crossing the track. He further testified: "I was aware from the first moment I saw the Ford [Backus' car] that it was waiting there to make a left turn." He did not remember if the Ford had a turn signal on. Backus testified that he had his light on which would indicate that

"Drivers making left turns invariably tend to tie up one lane of traffic and often on a four-lane street they tie up two lanes of traffic going in opposite directions. The Illinois regulation is intended to speed the making of left turns and eliminate such tie-ups, but drivers apparently are unfamiliar with it and turners are unwilling to chance dented fenders in trying to carry it out. . . . [The editorial then quoted the statute which is previously set out in this opinion.]

"As we read that law, a driver approaching the intersection must slow down or stop and allow a motorist making a left turn to proceed. The motorist making the turn has the right-of-way. Not many dare exercise it. Not many motorists stopped by a red light give left-turn makers the right-of-way when the light turns green.

"Since the regulation is generally ignored it seems to us that traffic engineers ought to attack the left turn problem from other angles. Why not make universal the system in use at many intersections through which traffic lights are timed to hold up vehicles going in one direction so as to permit the making of left turns by vehicles approaching from the opposite direction?"

(In the oral argument of this case on June 12, 1963 this question was raised by the court.)

he intended to make a left turn. There was no contradiction of that testimony. The driver of the bus further testified that after he had seen the car standing, waiting to make a left turn, he increased the speed of his bus from 15 to 20 miles an hour at which he was going when he crossed the tracks, to 25 or 28 miles an hour. This is a direct violation of a duty imposed upon him under the provisions of the statute. Once the driver of the bus saw the Backus car waiting to make a left turn he should have stopped his bus in time to permit the car to make the left turn. This he did not do, and by his violation of the statutory provision he was negligent and his negligence was an element in the accident which caused injury to the plaintiff.

■ The verdict of the jury is peculiar, in that the damages allowed seem to be based on some figure drawn out of the air. There is uncontradicted testimony in the record with reference to the result of the accident upon the physical condition of the plaintiff. It is true that she had been suffering from physical disabilities before the accident, but according to the testimony of her physician those had been completely alleviated but the accident aggravated the condition so as to cause her to undergo two surgical operations and a considerable amount of medical treatment. She herself testified as to the pain and suffering which she had undergone. In the case before us the Chicago Transit Authority concedes that the verdict was in the nature of a compromise verdict because in its opinion no negligence was proved on its part. It also argues that the damages awarded the plaintiff were adequate. With those contentions we do not agree. In Kinsell v. Hawthorne, 27 Ill App2d 314, 169 NE2d 678, the court said:

"It is the law in Illinois that a verdict should be set aside and a new trial granted for inade-

quacy of damages where it is clear that injustice has been done, or where it is obvious that a jury failed to take into consideration proper elements of damage which are clearly proven, or where it is apparent that the jury made a compromise between the guilt of the defendant and the damages sustained by a plaintiff. 28 ILP, New Trial, Sec 29; Montgomery v. Simon, 309 Ill App 516, 33 NE2d 642; Luner v. Gelles, 314 Ill App 659, 42 NE2d 313; Browder v. Beckman, 275 Ill App 193. In the case at bar, as heretofore noted, counsel for defendant concede that the verdict was the result of a compromise by the jury. Such a verdict, although not nominal, stands on no firmer foundation than a nominal one would. No post trial motion was filed by defendant so that it may be assumed that they regard the verdict as a victory for defendant. However, if defendant was not guilty of negligence he should not be required to pay any damages. By the same token if he was guilty, the plaintiff was entitled to a fair allowance of damages taking into consideration all elements which are to be considered. Based upon those elements we do not agree that the allowance made in this case is fair."

The court further said:

"Counsel for plaintiff ask for a reversal and remandment for new trial solely on the question of damages. We are not justified in ordering a new trial on the issue of damages alone where it appears that the damages awarded were the result of a compromise on the question of liability."

In the instant case we have the further objection that the judgment entered is not supported by the verdict, and it is even so inaccurate that it misquotes the verdict in the Pertolanitz suit against the defend-

271

ant Backus. In the verdict Backus was found not guilty. In the judgment order it is stated that the jury found him guilty.

The judgment of the Circuit Court of Cook County is reversed and the cause is remanded for a new trial and further proceedings consistent with the views expressed in this opinion.

Reversed and remanded.

SCHWARTZ, P. J. and DEMPSEY, J., concur.